## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

```
-------------------------------------------------------------
In re:                                )
                                      )      Chapter     7
CHARLES ATWOOD FLANAGAN,              )
                                      )
            Debtor.                   )      Case No.     99-30565 (ASD)
-------------------------------------------------------------
TITAN REAL ESTATE VENTURES, LLC,      )
                                      )
            Plaintiff                 )
vs.                                   )      Adv. Pro. No.  04-3146
                                      )
M.J.C.C. REALTY L.P., et al.,         )
                                      )
            Defendants.               )      Doc. I.D. No. 201
-------------------------------------------------------------
```

_____

APPEARANCES:

Stephen P. Wright, Esq.                    Attorney for Titan Real Estate
Harlow, Adams & Friedman                   Ventures, LLC
300 Bic Drive
Milford, Connecticut 06460


Edward C. Taiman, Jr., Esq.                Attorney for M.J.C.C. Realty L.P.
Sabia & Hartley, LLC
190 Trumbull Street, Suite 202
Hartford, Connecticut  06103-2205


_____


## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON MOTION FOR SUMMARY JUDGMENT


ALBERT S. DABROWSKI, Chief United States Bankruptcy Judge

# I.  INTRODUCTION

Before the Court at this time is the motion of the Defendant, M.J.C.C. Realty L.P. (hereafter, "MJCC"), for summary judgment on the First, Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth and Eleventh Counts of the Plaintiff's Complaint.  On the record as a whole, and for the reasons stated more fully below, this Court concludes that summary judgment should be granted in favor of MJCC.

# II.  JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a) and (c).  This proceeding is not a "core proceeding," but is "related to" a case under Title 11 within the contemplation of 28 U.S.C. § 157(c).  Nonetheless, the parties have expressly consented to this Court entering final orders and judgments.[1]

# III.  FINDINGS OF MATERIAL FACT NOT IN GENUINE ISSUE

The Court finds the following facts not to be in genuine issue based upon (i) a review of the files and records of this case and adversary proceeding; (ii) prior evidentiary hearings in this adversary proceeding;[2] and (iii) a comparison of MJCC's

---

[1]  Fed. R. Bank. P. 7012(b) provides, *inter alia*, that "[i]n non-core proceedings final orders and judgments shall not be entered on the bankruptcy judge's order except with the express consent of the parties."  *See* Letter from the Plaintiff's attorney dated August 3, 2007 (attaching correspondence from the attorney for MJCC) (Doc. I.D. No. 209), transmitted to the Court in response to an in-court inquiry by this Judge, on August 1, 2007, as to whether the parties consented to this Court entering a final order and/or judgment in connection with the instant contested matter and adversary proceeding.

[2]  In particular, this Court received extensive testimony concerning the material facts in this proceeding at a hearing on the Plaintiff's requests for prejudgment remedies held on August 29 and 30, 2005.

Local Rule 56(a)1 Statement with the Plaintiff-Respondent's Local Rule 56(a)2 Statement.

1.   Prior to the commencement of the underlying bankruptcy case, the Cadle Company and/or D.A.N. Joint Venture (hereafter collectively referred to as "Cadle") purchased one or more delinquent debt instrument(s) on which Charles A. Flanagan (hereafter, "Flanagan") was an obligor.

2.   Cadle obtained a judgment against Flanagan, and aggressively pursued collection of the same for several years.

3.   Flanagan prevented Cadle from satisfying its judgment by engaging in an evasive course of conduct designed to insulate his property from execution.

4.   Flanagan's evasive conduct included the creation and funding of MJCC, which purchased and/or held legal title to at least two parcels of Connecticut real property in which Flanagan arguably held equitable interests, namely (i) 230 Millbrook Road in the Town of North Haven (hereafter, the "Millbrook Property"), and (ii) 25 Queach Road in the Town of Branford (hereafter, the "Queach Property").

5.   The principal of MJCC was Angela Cimino Burr (hereafter, "Burr") – Flanagan's mother-in-law.

6.   It is clear to this Court from Burr's own testimony that her role with MJCC was merely that of a figurehead.  While she was nominally the general partner of MJCC, and owned at least 95% of its equity, in reality Flanagan supplied all of the capital for its activities, and solely directed its management.  Burr undertook her nominal role with MJCC solely out of love and concern for her daughter and grandchildren.

7.   On February 17, 1999 (hereafter, the "Petition Date"), Flanagan commenced

the underlying bankruptcy case through the filing of a voluntary petition under Chapter 11.

8.   The Petition, Schedules and Statements filed by Flanagan in connection with his bankruptcy case make no mention of any interest he may have had in MJCC and/or the Millbrook and Queach Properties (hereafter, collectively, the "Properties").

9.   Although the facts and circumstances of Flanagan's alleged equitable interest in MJCC and its real estate holdings were known to Flanagan, his attorney, and the Official Unsecured Creditors' Committee (hereafter, the "Committee") during the pendency of Flanagan's Chapter 11 case, neither the Committee nor Flanagan, as debtor-in-possession, ever pursued an action to recover MJCC and/or the Properties for the benefit of Flanagan's Chapter 11 bankruptcy estate.

10.   On January 16, 2003, Flanagan's Chapter 11 case was converted to a case under Chapter 7.

11.   Upon the conversion of Flanagan's bankruptcy case, Bonnie Mangan (hereafter, the "Trustee") was appointed Chapter 7 trustee of his estate.

12.   Almost immediately upon her appointment, the Trustee became aware of Flanagan's putative interest in MJCC and the Properties.

13.   The Trustee declined to initiate an adversary proceeding in pursuit of MJCC or the Properties for the benefit of the bankruptcy estate.  Instead, on August 4, 2004, she sold "any and all interest . . . which [she] . . . may have [had] . . . in and to MJCC . . . together with any and all interest which . . . [she] may have [had] . . . in [the Properties]" to Titan Real Estate Ventures, LLC – the Plaintiff-Respondent here (hereafter, "Titan") – for the sum of $15,000.00 cash and 2.5% of "any net recovery . . . [Titan] receives as a

-4-

direct result of its purchase of the subject rights and interests."

14.   On or about April 4, 2001, Cadle commenced litigation in the District Court, in which it sued approximately 13 defendants on civil RICO claims, alleging that the defendants were co-conspirators in an effort to assist Flanagan in evading Cadle's judgment execution activity (hereafter, the "RICO Litigation").   One of the defendants in the RICO Litigation was Burr.

15.   In or about January 2003, Cadle settled its RICO Litigation claims against Burr in the following manner:   Cadle agreed to release of any and all claims it had against Burr in exchange for an assignment from Burr to Cadle of Burr's interest in MJCC.[3]

16.   By virtue of its settlement with Burr, Cadle achieved control over MJCC and the Properties; and through MJCC, Cadle began a process of marketing the Properties to compensate for its losses vis-a-vis Flanagan.

17.   On or about March 30, 2004, Cadle, through MJCC, sold the Millbrook Property to Steven and Amy Sullivan for approximately $485,000.00.

18.   With respect to the Queach Property, Cadle, through MJCC, has attempted to evict a tenant there in a preliminary step toward its intended marketing and sale of that property.   The Queach Property tenant is one William Nygard (hereafter, "Nygard"), who is the former owner of that property.   Flanagan and/or MJCC (while under Flanagan's control) purchased the Queach Property from Nygard but granted a 15-year lease to allow him to remain in possession of the property.

---

[3] On June 10, 2005, a jury in the RICO Litigation rendered a $500,000.00 verdict against the remaining defendants.

19.  As assignee of the Trustee's supposed rights, Titan now seeks to recover the Millbrook and Queach Properties, or their value, for its own benefit.  As Plaintiff here, Titan is prosecuting claims against MJCC, *inter alia*, via a Second Amended Complaint filed March 21, 2005 (Doc. I.D. No. 86) (heretofore and hereafter, the "Complaint").

## IV.  CONCLUSIONS OF LAW

**Summary Judgment Standards.**

1.  Federal Rule of Civil Procedure 56(c), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, directs that summary judgment enter when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

2.  When ruling on motions for summary judgment "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

3.  The moving party has the burden of showing that there are no material facts in dispute and all reasonable inferences are to be drawn, and all ambiguities resolved, in favor of the non-moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

4.  Rule 56(a) of the Local Civil Rules of the United States District Court for the District of Connecticut (heretofore and hereafter, "Local Rule(s)") supplements Fed. R. Civ. P. 56(c) by requiring statements of material fact from each party to a summary judgment motion.  In the present matter, both of the parties are in material compliance with the requirements of Local Rule 56.

-6-

**The Merits.**

5.  Titan's Complaint states five types of claims against MJCC:  (i) "piercing the corporate veil", (ii) turnover, (iii) conversion, (iv) unjust enrichment, and (v) constructive trust (hereafter, collectively, the "Titan Claims").

6.  As noted in the Findings of Fact above, the Titan Claims are wholly derivative of the rights of the Trustee.  Thus Titan can prevail on its Claims only if, and to the extent that, the Trustee would have prevailed on identical claims at a point in time immediately prior to her assignment of rights and interests to Titan.

7.  A bankruptcy trustee's powers are necessarily delimited by federal statutory law, namely the United States Bankruptcy Code.

8.   The only statutory sources identified by Titan for the trustee rights and standing asserted by it here are Bankruptcy Code Sections 541(a)(1) and 542.[4]

9.  It is thus the job of this Court to determine whether, in fact, any of the Titan Claims are viable when viewed through the prism of the available statutory sources of trustee authority.

*Analysis of Titan's Claims under Section 541(a)(1).*

10.  Bankruptcy Code Section 541(a) describes the range of property of a bankruptcy estate.   Subsection (1) of Section 541(a) comprises the most substantial component of that property for most all bankruptcy estates.   Specifically, with exceptions not relevant here, Section 541(a)(1) provides that property of an estate includes "all legal or equitable interests of the *debtor* in property *as of the commencement of the*

---

[4] Notably, Titan declines at this time to assert any of the Trustee's "hypothetical creditor" rights and powers under Code Section 544, even though, as discussed more fully *infra*, that statutory source provides the most coherent basis for the core Titan Claims.

*[bankruptcy] case*." (emphasis supplied).

11.   Accordingly, in assessing the property at issue in this adversary proceeding under Section 541(a)(1), the Court must focus directly and exclusively upon what rights and interests Flanagan possessed as of the Petition Date.  See Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991) ("Under the Bankruptcy Code the trustee stands in the shoes of the bankrupt . . . and has standing to bring any suit that the bankrupt . . . could have instituted had [he] not petitioned for bankruptcy.").

12. Neither the entity MJCC nor any of the Properties were legally Flanagan's property on the Petition Date and thus, were not then, or now, property of his bankruptcy estate.

13. At most, Titan alleges that Flanagan, and hence his bankruptcy estate, possessed an *equitable interest* in MJCC and the Properties on the Petition Date.

14. Thus, if Titan, as assignee of the estate's rights and interests, is to recover MJCC or any of the Properties, it can do so *under Section 541(a)(1)* only by establishing the alleged Flanagan equitable rights or interests through one or more *causes of action possessed by Flanagan prior to the Petition Date*.

15. Accordingly, the essential question is which, if any, of the Titan Claims were viable causes of action *in Flanagan's hands* immediately prior to the filing of his bankruptcy case?[5]

> ***The alter ego claim.***

---

[5] Although Titan's briefing in this matter strongly asserts that it is prosecuting Flanagan's own pre-petition claims in the instant adversary proceeding, it is curious and a bit disconcerting that Titan's Complaint does not present its Claims in that manner or even allude to Code Section 541(a)(1) as a statutory basis for such Claims.

16. The Eleventh Count of Titan's Complaint – denominated "Piercing the Corporate Veil" – asks the Court to ignore the separate legal existence of MJCC, such that "MJCC's title ownership . . . [is] disregarded, and the assets of MJCC . . . [are] considered the assets of the [Flanagan bankruptcy] Estate, and by extension [Titan]." "Piercing" actions of this nature are often referred to as "alter ego" claims.

17. Although there is precedent for bankruptcy trustees deriving and prosecuting alter ego claims under the authority of Code Section 541(a)(1), see Pepsico, Inc. v. Banner Industries, Inc., 884 F.2d 688, 700 (2d Cir. 1989), the Trustee here could have possessed an alter ego claim *by virtue of Section 541(a)(1)* only if *Flanagan himself* had a viable claim of that nature immediately prior to filing his bankruptcy case.

18. Whether, prior to bankruptcy, Flanagan possessed the alter ego claim now pled and averred by Titan is a question of state law.  In Connecticut, "[c]ourts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed . . . ."  Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., 187 Conn. 544, 552, 447 A.2d 406 (1982).

19. Titan's Complaint alleges that Flanagan dominated and controlled MJCC; and those allegations find strong support in the undisputed record of this case and adversary proceeding.

20. However, Titan's alter ego claim (hereafter, the "Alter Ego Claim") does not state a classic "veil piercing" claim – in which a creditor seeks to disregard the legal

autonomy of a *corporate* entity[6] to reach the assets of a controlling shareholder in order to satisfy direct claims against the corporation from the assets of that shareholder. Read most favorably to Titan, the assertion here more accurately embodies an attempt to disregard the separate legal existence of a limited partnership in order to access *its* assets for the purpose of satisfying claims against a controlling individual. Claims with this general structure are sometimes referred to as "reverse piercing" claims.[7]

21. "Reverse piercing" claims have been recognized as viable causes of action in Connecticut, see, e.g., Litchfield Asset Management Corp. v. Howell, 70 Conn.App. 133, 151, 799 A.2d 298, 312 (Conn. App. 2002), cert. denied, 261 Conn. 911, 806 A.2d 49 (2002), because the same equitable principles supporting traditional "piercing" *can* be present in the reverse context as well. In other words, "a reverse pierce is a viable remedy that a court may employ when necessary to achieve an *equitable result* and when *unfair prejudice* will not result." Id. (emphasis supplied).

22. Laying the question of equity and prejudice to the side for the moment, the Court is ultimately not so much troubled with the *direction* of the "pierce", but with the *identity* of the "piercer". As prosecuted under Code Section 541(a)(1), and thus necessarily derivative of Flanagan's pre-petition claims, the Alter Ego Claim "piercer" must be Flanagan himself. Yet Titan has not cited, and the Court cannot locate, any Connecticut authority permitting an individual to "reverse pierce" his own "veil". Instead,

---

[6] The fact that MJCC is a limited partnership does not alter the analysis here. *See Litchfield Asset Management Corp. v. Howell*, 70 Conn.App. 133, 147, 799 A.2d 298, 310 (Conn. App. 2002), *cert. denied*, 261 Conn. 911, 806 A.2d 49 (202).

[7] At least one surveyor/commentator has made a further distinction between so-called "insider reverse piercing" and "outsider reverse piercing". G. Crespi, *The Reverse Pierce Doctrine: Applying Appropriate Standards*, 16 J. Corp. L. 33, 37 (1990). That distinction has relevance to the putative Alter Ego Claim at bar, which is necessarily an instance of *insider* (Flanagan) reverse piercing as discussed *infra*.

these types of claims are almost uniformly initiated and prosecuted by creditors or other third parties.

23. Moreover, in analyzing Flanagan's pre-petition rights, the most important and limiting aspect of the insider reverse piercing action that Titan necessarily envisions here is the fact that Flanagan, as putative plaintiff, would have been subject to all equitable disabilities suggested by the facts.

24. Chief among those disabilities would have been the doctrine of *in pari delicto*. This well-established equitable doctrine provides that actions brought on illegal or corrupt bargains cannot prevail if the plaintiff is *in pari delicto*, *i.e.*, where he has been a significant participant in the subject wrongdoing, bearing at least equal responsibility for the violations he seeks to redress.  See, e.g., Greenberg v. Evening Post Association, 91 Conn. 371, 375, 99 A. 1037 (1917).

25. "The real objection is not to one man's unclean hands but to the whole enterprise. The court does not want to touch an unlawful transaction with a ten-foot pole. It always refuses to help carry it out, and it often refuses to pick up the pieces after the enterprise has fallen apart. Courts were set up to enforce the law, not to enforce violations of law."  Zappone v. Zappone, 8 Conn. L. Rptr. 449, 1993 WL 73674, *5 (Conn. Super. 1993).

26. Stated most concisely, the *in pari delicto* doctrine provides that when the parties are involved in an illicit transaction, the court should "leave them where it finds them." Funk v. Gallivan, 49 Conn. 124 (1881).

27. The following language of <u>Funk</u> is particularly apropos under the facts that necessarily underlie the Alter Ego Claim, if asserted under Code Section 541(a)(1):  "In such cases the defense of illegality [*i.e.,* the *in pari delicto* doctrine] prevails, not as a protection to the defendant, but as a *disability* in the plaintiff.  Upon this principle[,] possession acquired . . . will often avail the parties holding it as a sufficient title . . . the transaction takes effect from *the disability of the parties to assert any right to the contrary*.  The court does not give it effect, but simply refuses its aid to undo what the parties have already done." <u>Id.</u>, at 129 (<u>quoting</u> <u>Myers v. Meinrath</u>, 101 Mass. 366, 368 (Mass. 1869)) (emphasis supplied).

28. There can be no reasonable doubt that Flanagan and MJCC (and its principals) were engaged in one or more illicit transactions when they formed and operated MJCC for the purpose of defrauding and/or hindering Flanagan's creditors by concealing his true interest in the Properties.[8]

29. The transaction(s) between Flanagan and MJCC necessarily included an explicit or implicit agreement that MJCC would "return" the Properties to Flanagan at his direction at some time in the future.  Thus, under the unique circumstances of this case, disregarding the separate legal existence of MJCC would be tantamount to giving effect to, or enforcing, the illicit agreement(s) through which MJCC was created.  This is precisely what the *in pari delicto* doctrine seeks to prevent.  Again, as stated in <u>Funk</u>, the Court "does not give it [the illicit transaction] effect, but simply refuses its aid to undo what the parties have already done." <u>Id.</u>

---

[8] Titan admits that Flanagan was involved in an illegal transaction regarding MJCC.  *See, e.g.,  Plaintiff's Memorandum in Support of Objection to Defendant, M.J.C.C. Realty L.P.'s Motion for Summary Judgment* (Doc I.D. No. 206) (hereafter, "Respondent's Memorandum") at 22.

-12-

30. Titan's response to the applicability of the *in pari delicto* doctrine is a misdirection. Instead of tackling the disability head-on, it addresses a broader doctrine – "unclean hands", which, it claims, has been applied in Connecticut only when a party seeks to "enforce" a bargain, transaction or agreement. Titan then denies that its Alter Ego Claim is an "enforcement" type of action.

31. Titan's arguments are off the mark in several respects. First, Titan confuses the general doctrine of "unclean hands" with the *in pari delicto* doctrine specifically applicable here. While both equitable doctrines impose a conduct-related disability on a party, their nature and object under Connecticut law are quite different. The *in pari delicto* doctrine *necessarily* relates to an *illicit transaction*, whereas the legality of the *transactional* context is irrelevant to the unclean hands doctrine. The focus and objectives of the doctrines are also different: the focus of "unclean hands" is on one party's misconduct, whereas the *in pari delicto* doctrine is more concerned with the transaction as a whole. With *in pari delicto*, "[t]he *real objection is not to one man's unclean hands but to the whole enterprise*. The court does not want to touch an unlawful transaction with a ten-foot pole." Zappone, supra, at *5 (emphasis supplied).

32. Furthermore, even if "unclean hands" and *in pari delicto* were coextensive doctrines, Titan's equitable disability would still obtain. Titan's argument that it "does not seek to **enforce** . . . [Flanagan's] illegal transaction", Respondent's Memorandum at 22 (double emphasis in original), but rather, that it is "disaffirming the transaction . . . *undoing* the transaction for the *benefit of all*", id. (emphasis supplied), is a semantic distinction without substantive significance. Whether Flanagan were looking to "enforce" his illicit MJCC agreement, or seeking to "disaffirm" or "undo" that transaction, is of no

moment since the result would be the same – a court would be asked to place the relevant property interests in Flanagan's hands. As noted in ¶ 29 of these Conclusions of Law, that result flies in the face of important equitable principles.

33. By claiming that it is seeking to undo or disaffirm the subject transaction "for the benefit of all", Titan attempts to make its Alter Ego Claim more attractive by implying that it is brought on behalf of Flanagan's actual creditors. That implication is unwarranted since the claim is in fact brought by a non-creditor – Titan – principally for its own benefit.[9] More fundamentally however, "[i]t is well settled that a bankruptcy trustee [and thus her assignee] has no standing generally to sue third parties *on behalf of the estate's creditors*, but may only assert claims held by the bankrupt . . . [himself]." Wagoner, supra, at 118 (emphasis supplied). And as discussed above, claims "held by the bankrupt" are subject to state law-based equitable disabilities such as *in pari delicto*. As the Second Circuit Court of Appeals has observed, "when a bankrupt . . . has joined with a third party in defrauding [his] creditors, the trustee cannot recover against the third party for the damage to the creditors." Id.

34. No principle of bankruptcy law preempts applicable state law so as to immunize Titan, as Flanagan's successor under Section 541(a)(1), from Flanagan's *in pari delicto* disability. See, e.g., Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1150-52 (11th Cir. 2006); cf. Official Committee of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP, 322 F.3d 147, 158-66 (2d Cir. 2003).

---

[9] The fact that the Flanagan bankruptcy estate retains a 2.5% interest in any recovery on the Titan Claims (the "Retained Interest") does not materially change this conclusion since Titan owns a 97.5% interest in those Claims. To place the matter in a telling quantitative context, the Court notes that by selling a 97.5% interest in the Titan Claims for $15,000.00, the Trustee logically must have valued the estate's Retained Interest at only $384.62.

35. The incongruity of Titan's Alter Ego Claim, if pursued under Section 541(a)(1), is perhaps best illustrated by one of Titan's own averments. In the Eleventh Count of the Complaint, at ¶ 77, Titan asserts that "[a]s a direct result of Flanagan's actions *the Plaintiff* has suffered unjust losses." (emphasis supplied). Of course, when assessing the viability of a claim founded on Section 541(a)(1) we must view the "Plaintiff" to be the debtor – in this case Flanagan. Therefore, Titan's averment must necessarily be that "as a direct result of Flanagan's actions, *Flanagan* has suffered unjust losses." The absurdity of such a claim is self-evident. As with the *in pari delicto* doctrine, the courts should not be burdened with a party's attempt to prosecute such a claim. Certainly, this Court should not be involved in what is, at its essence, the enterprise of saving Flanagan from himself.

36. Again, the present question is not a general inquiry into what rights a bankruptcy trustee has, or should have, to undo illicit pre-petition transactions. Congress has given those trustees sufficient powers through *e.g.,* Code Sections 544 and 548, to avoid all pre-petition debtor transactions which it felt should be voidable. Yet, in prosecuting the Alter Ego Claim Titan does not purport to be pursuing a bankruptcy avoidance action. Rather, it claims to be prosecuting the personal Petition Date claims of Flanagan under Section 541(a)(1). Accordingly, the narrow focus here is on what, if any, rights and claims *Flanagan* possessed vis-a-vis MJCC immediately prior to his bankruptcy filing. The Trustee inherited those rights and claims *cum onere* under Section 541(a)(1) and, in turn, assigned those rights and claims to Titan, *cum onere*.

37. Here, the material facts not in genuine issue portend that because of his apparent wrongdoing in the formation, funding and operation of MJCC, Flanagan would

not have had a legally-enforceable pre-petition right to "pierce a veil" of his own construction to compel the assets of MJCC to be transferred to his legal ownership. Further, Titan has not demonstrated any fact or legal principle that would nonetheless have permitted its assignor – the Trustee – to pursue what is essentially the identical claim - the Alter Ego Claim - pursuant to Section 541(a)(1).

### The conversion claims.

38. Titan's claims of conversion found in the Sixth and Seventh Counts of its Complaint (hereafter, the "Conversion Claims") cannot be maintained under Section 541(a)(1).

39.   Conversion under Connecticut law is an unauthorized assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights.  See, e.g., Aetna Life and Cas. Co. v. Union Trust Co., 230 Conn. 779, 790, 646 A.2d 799, 804.

40. Through the Conversion Claims Titan alleges that MJCC has "stolen . . . or knowingly received and concealed" the Queach Property (Sixth Count) and the *sale proceeds of the Millbrook Property* (Seventh Count).  Since the sale proceeds of the Millbrook Property did not exist in the pre-petition period, it is evident that at least the Seventh Count is not truly being prosecuted under Section 541(a)(1) as a pre-petition claim of Flanagan.

41.   Moreover, even if the Conversion Claims are both premised on alleged claims *of Flanagan,* inherited by the Trustee pursuant to Section 541(a)(1), then such claims would be those of one conspirator in an illicit transaction against another conspirator in

that same transaction.  As such, the doctrine of *in pari delicto* would prevent recovery, as explained at length in ¶¶ 23 - 34 of these Conclusions of Law.

42.   Accordingly, any rights the Trustee may have possessed against MJCC in connection with an alleged conversion could not have been derived under Section 541(a)(1).  Thus the Sixth and Seventh Counts of the Complaint are not viable on that basis.

***The unjust enrichment claims.***

43.   In the Eighth and Ninth Counts of the Complaint, Titan seeks to recover from MJCC for "unjust enrichment" with respect to the Properties (hereafter, the "Unjust Enrichment Claims").

44.   As pled, it is conceivable that the Unjust Enrichment Claims were possessed by Flanagan pre-petition, and thus inherited by the Trustee under Section 541(a)(1).  In theory then, they are assertable by Titan as the Trustee's assignee.

45.   Nonetheless, the undisputed material facts indicate that Flanagan could not have prevailed on a pre-petition claim against MJCC for unjust enrichment.

46.   "A right of recovery under the doctrine of unjust enrichment is *essentially equitable*, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him *at the expense of another.*" Providence Electric Co., Inc. v. Sutton Place, Inc., 161 Conn. 242, 246 (1971) (internal citations omitted) (emphasis supplied).  "It is clear that in order to recover on the basis of unjust enrichment, it is necessary for a plaintiff to demonstrate two aspects of the transaction. First, it must be shown that the defendant was benefited; that is, he has received something of value.  And second, it must be shown that the benefit was unjust;

-17-

that it was not paid for by the defendant, *to the detriment of the plaintiff*." Id. (emphasis supplied).

47. The conduct of Flanagan, and the relationship between him and MJCC, in the pre-petition period does not provide a factual basis for a claim of unjust enrichment. In the pre-petition period – *i.e.* prior to Cadle acquiring control of MJCC – there certainly was no antagonism between MJCC and Flanagan. After all, MJCC was Flanagan's creation, and he exercised complete control over its operation until such time as Cadle acquired the rights and interests of Burr. While the facts might show that MJCC received a technical benefit through its ownership of the Properties, it cannot be shown that such benefit was unjust toward, or "to the detriment of," Flanagan in the pre-petition period. Quite the opposite in fact; MJCC's holding of the Properties was designed by Flanagan to be, and was in fact, *for his benefit*.

48. Finally, under any scenario, the Unjust Enrichment Claims, to the extent they were inherited by the Trustee under Section 541(a)(1), would be precluded by the doctrine of *in pari delicto*, as explained at length in ¶¶ 23 - 34 of these Conclusions of Law.

49. In sum, because in the pre-petition period he enjoyed no equities vis-a-vis MJCC, Flanagan could not have possessed a viable unjust enrichment claim against MJCC. Hence, the Trustee could not have inherited such a claim via Section 541(a)(1), and thus not assigned the same to Titan for prosecution in this proceeding.

### The constructive trust claims.

50.   In the First and Second Counts, Titan seeks to have MJCC declared to be a constructive trustee of the Queach and Millbrook Properties, of which Flanagan was an alleged beneficiary.

51.   As with the Unjust Enrichment Claims, it is *conceivable* that the Constructive Trust Claims, *as pled*, were possessed by Flanagan pre-petition, and thus inherited by the Trustee under Section 541(a)(1).  In theory then, they are assertable by Titan as the Trustee's assignee.

52.   However, the undisputed material facts indicate that Flanagan could not have prevailed on a pre-petition claim against MJCC for recognition of a constructive trust.

53.   In Connecticut, "a constructive trust arises . . . against one, who by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds legal title to property which he ought not, in equity and good conscience, hold and enjoy.  Zack v. Guzauskas, 171 Conn. 98, 103, 368 A.2d 193 (1976).

54.   The pre-petition conduct of Flanagan, and the relationship between him and MJCC, does not provide a factual basis for recognition of a constructive trust in favor of Flanagan as trust beneficiary.  In the pre-petition period – *i.e.* prior to Cadle acquiring control of MJCC – "equity and good conscience" were not offended vis-a-vis MJCC and Flanagan by the arrangement between those parties with respect to the Properties. Once again, MJCC was Flanagan's creation, and he exercised complete control over its operation until such time as Cadle acquired the rights and interests of Burr.

55.  It is thus simply disingenuous to suggest that in the pre-petition period, while under Flanagan's control, MJCC held its legal interest in the Properties vis-a-vis Flanagan by virtue of its *own* "fraud, . . . duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means".  Nor can it be said that in the pre-petition period it was against equity and good conscience *vis-a-vis Flanagan* for MJCC to hold legal title to the Properties.[10]  That titling is precisely the legal reality which Flanagan desired and intended.

56.  Finally, under any scenario, the Constructive Trust Claims, to the extent they were inherited by the Trustee under Section 541(a)(1), would be precluded by the doctrine of *in pari delicto*, as explained at length in ¶¶ 23 - 34 of these Conclusions of Law.

57.  In sum, in the pre-petition period, Flanagan enjoyed no beneficial rights, constructive or otherwise, vis-a-vis MJCC.  Hence, the Trustee could not have inherited beneficial rights via Section 541(a)(1), and consequently, could not have assigned the same to Titan for prosecution in this proceeding.

### *The turnover claims.*

58.  In the Third and Fourth Counts of the Complaint Titan states claims pursuant to Bankruptcy Code Section 542(a), seeking "turnover" from MJCC of the Queach

---

[10] The Court is not unmindful of the fact that the Flanagan-MJCC arrangement was almost certainly against equity and good conscience *vis-a-vis Flanagan's creditors*.  Unfortunately for Titan, the Trustee did not have a general right to sue MJCC on behalf of the actual creditors of Flanagan, as discussed more fully at ¶ 33 of these Conclusions of Law.  If the Trustee desired to pursue constructive trust claims against MJCC, she should have prosecuted them via her "hypothetical creditor" rights under Section 544(a).  The present viability of such claims under Section 544(a) is discussed *infra*.

Property and the proceeds of sale of the Millbrook Property, as well as the income generated therefrom (hereafter, the "Turnover Claims").

59.  By definition, turnover claims pursuant to Section 542 are not viable causes of action under Section 541(a)(1) because, as claims only arising in favor of a trustee on the Petition Date, they could not have been owned by Flanagan immediately prior to the commencement of his bankruptcy case.

### *Analysis of Titan's Claims under Code Section 544(a).*

60.  Although Titan now appears to have withdrawn any reliance on Code Section 544 as a statutory basis for assertion of any of its Claims, this Court will discuss the viability of claims of that nature because, in the Court's view, Section 544 is the most natural basis for one or more of Titan's Claims.[11]

61.  A bankruptcy trustee's powers under Section 544 serve to augment the *debtor* rights and interests that she inherits under Section 541(a)(1).  Specifically, Section 544 affords her the powers of certain *hypothetical creditors*, *inter alia*.  When a trustee successfully exercises these "strong-arm" powers, her monetary or in-kind recovery is made pursuant to Section 550, which *then and thereby* becomes "property of the estate" by virtue of Section 541(a)(3).

62.  Section 544(a), provides, *inter alia*, that –

> "[t]he trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the *rights and powers* of . . . (2) *a creditor* that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an *execution against the debtor that is returned unsatisfied* at such time, whether or not such a creditor exists . . . ."

---

[11] In connection with this analysis the Court assumes, without deciding, that a bankruptcy trustee may lawfully assign to a private third party her Code-based avoidance rights and strong-arm powers, such as those arising under Section 544.

(1999) (emphasis supplied).

63. Therefore, the essential question under Section 544(a)(2) is whether the claim that a trustee is asserting is one that an execution creditor would possess under applicable law?  At least two of the Titan Claims – the Alter Ego and Constructive Trust Claims – are claims that an execution creditor may prosecute under Connecticut law.

64. Thus, the Alter Ego and Constructive Trust Claims appear to have a more natural and effective foundation under Section 544(a)(2) than they do under Section 541(a)(1).[12]   This is true primarily because the assertion of claims to recognize a constructive trust and/or disregard separate legal identity, *on behalf of a hypothetical unsatisfied judgment creditor,* would be limited by none of the equitable deficiencies – such as the *in pari delicto* disability – that they suffer in the hands of Flanagan, as detailed in ¶¶ 23 - 34 of these Conclusions of Law.

65. Critically though, this Court concludes that any claims the Trustee might have possessed under Section 544 were lost by operation of the limitations provisions of Bankruptcy Code Section 546(a) prior to her assignment of those claims to Titan.[13]

---

[12] The Alter Ego Claim is just the sort of equitable action that could have been pursued by an unsatisfied execution creditor of the Flanagan outside the context of bankruptcy.  *See, e.g., Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1345 (7th Cir. 1987) (". . . alter ego theory is an equitable, remedial doctrine that may be asserted by any creditor without regard to the specific nature of his relationship with the . . . [debtor] and its alleged alter ego."); *see also*, Boyce, Steven E., *Koch Refining and In Re Ozark: The Chapter 7 Trustee's Standing to Assert an Alter Ego Cause of Action*, Am. Bank. Law J. (Summer 1990).

[13] Titan has argued that the "law of the case" doctrine prevents this Court from making this conclusion at this time because the Court previously denied MJCC's Rule 12(b) motion (Doc. I.D. No. 32) which had asserted the limitation of Section 546(a) as grounds, *inter alia*, for dismissal.  The law of the case doctrine is *discretionary*, and  does not prevent a court from reconsidering its own prior determinations. *See, e.g., Sagendorf-Teal v. County of Rennselaer*, 100 F.3d 270, 277 (2d Cir. 1996).  In this proceeding though, reconsideration is not even necessary since, in denying MJCC's motion to dismiss,  this Court did not render a conclusion of law with respect to the effect of Section 546.

66. Bankruptcy Code Section 546(a)(1)(B) states, *inter alia*, that a trustee may not commence an "action or proceeding under section 544, 545, 547, 548, or 553" after, at the latest, "1 year after the appointment or election of the first trustee under section 702 . . . ."

67. Since the Trustee was appointed in January of 2003, it appears beyond dispute that Section 546(a)'s limitations period expired prior to the Trustee's August 4, 2004 assignment of rights and claims to Titan.[14]   Thus, any hypothetical creditor claims that Titan might have received under 544 were stale in the hands of the Trustee prior to assignment.

68. Therefore, to the extent, if any, that the Titan Claims are premised upon Section 544(a)(2), or any other section subject to Section 546(a)'s limitation provisions, such Claims, if any, were lost prior to their putative assignment to Titan.

**Analysis of Titan's Claim under Code Section 542.**

69. Titan asserts that Code Section 542 provides a statutory basis for the Turnover Claims found in the Third and Fourth Counts of its Complaint.

70. Code Section 542(a) provides in relevant part that ". . . an entity . . . in possession, custody, or control, during the case, of *property that the trustee may use, sell, or lease* under section 363 . . . , shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." (emphasis supplied).   Under Section 363(b), the Trustee may only "use, sell, or lease . . . *property of the estate*." (emphasis supplied).   In other words,

---

[14] It is also possible, if not likely, that the limitations period of Section 546(a) elapsed during the Chapter 11 phase of Flanagan's bankruptcy case.  *See* 11 U.S.C. § 546(a)(1)(A).

Section 542 provides authority for a trustee to compel entities to turn over property to her when it is "property of the estate."

71.     Titan's Turnover Claim is not viable under Section 542.   The most fundamental reason for this invalidity is the fact that the assets that Titan is seeking to recover – the Properties – are not presently property of Flanagan's estate.   Titan concedes that the Properties are not the legal property of the estate, but nonetheless asserts that Flanagan, and thus his bankruptcy estate, had an equitable interest in MJCC and the Properties.   However, the nature and essence of any such equitable interest is that of a *claim*, *i.e.,* an equitable cause of action, *e.g.,* the Alter Ego Claim.   In other words, at most, the only relevant "property of the estate" were the Titan Claims; for the Properties themselves to become "property of the estate" the Trustee would first have to prevail on a declaratory cause of action such as the Alter Ego Claim.   See, e.g., 11 U.S.C. §§ 541(a)(1), (3), (7).

72.     Stated somewhat differently, Titan already possesses all of the estate's property relating to MJCC and the Properties; *i.e.,* the Titan Claims.   Titan has no need for turnover under Code Section 542 to vindicate its assigned equitable interest in MJCC and/or the Properties.

73.     As discussed, supra, in these Conclusions of Law, Titan cannot prevail on any of the claims of its Complaint which seek a judgment declaring that the Properties are or were property of Flanagan's bankruptcy estate.   Accordingly, Titan's claims under Section 542 must likewise fail.

## V.  CONCLUSION

Based upon the foregoing findings and conclusions, this Court determines that there are no material facts in genuine issue in this proceeding, and that the Defendant MJCC is entitled to judgment as a matter of law on the First, Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth and Eleventh Counts of the Plaintiff's Second Amended Complaint.   Accordingly, the Court has this day subscribed a separate order and judgment **GRANTING** the pending motion of MJCC for summary judgment (Doc. I.D. No. 201), and entering judgment in accordance therewith.

Dated: August 9, 2007                                          BY THE COURT

Albert S. Dabrowski
Chief United States Bankruptcy Judge